Albert FRADKIN, Plaintiff,

v.

William T. ERNST, et al., Defendants.

No. C83–1323A.

United States District Court,
N.D. Ohio, E.D.

Sept. 1, 1983.

Gene Mesh, Cincinnati, Ohio, Stephen Lowey, New York City, Alan L. Melamed, Cleveland, Ohio, for plaintiff.

S. Michael Bradley, New York City, Joseph Holden, Akron, Ohio, for defendants.

## MEMORANDUM OPINION and JUDGMENT ENTRY

DOWD, District Judge.

This case involves a challenge to the implementation of the 1983 stock option plan (Plan) for the senior executives of Mohawk Rubber Company (Mohawk). The Plan was approved by Mohawk's Directors on January 4, 1983, and presented to and allegedly approved by the shareholders at Mohawk's Annual Meeting. Plaintiff contends that a proxy statement issued to shareholders describing the Plan prior to the Annual Meeting violated the federal securities laws. Plaintiff also argues that the Plan constitutes corporate waste and that the Plan was not approved by the requisite number of shareholders at Mohawk's annual shareholder's meeting.

### I. PROCEDURAL HISTORY

Plaintiff filed the complaint in this case on March 25, 1983. An amended complaint, raising class action and derivative claims, was filed on April 18, 1983 and is now the subject of this law suit. Count I of the amended complaint alleges violations of § 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a–9. Count II alleges a cause of action in common law corporate waste. Count III of the amended complaint seeks a declaratory judgment that the Plan was not approved pursuant to the terms of the Plan. Finally, Count IV of the Amended Complaint seeks a declaratory judgment that the Plan was not approved pursuant to Mohawk's code of regulations.

The Court laid out the early procedural history of this case in its order denying the defendant's motion to dismiss and granting plaintiff's motion for class certification.[1]

This case was tried to the Court from June 9, 1983 through June 13, 1983. At the close of the testimony, a briefing schedule was agreed to by the parties. Defendants further agreed to take no further action toward implementing the Plan pending the Court's resolution of this lawsuit. Based upon the trial testimony and the exhibits introduced into evidence, the Court makes the following findings of fact and conclusions of law:

### II. FINDINGS OF FACT

#### A. *Parties.*

Mohawk Rubber Company is an Ohio corporation with its principal offices in Hudson, Ohio. Mohawk's principal business is the manufacture of tires sold in the replacement market for passenger cars and trucks. Mohawk also operates other diverse enterprises related to the rubber industry. During the last five years, Mohawk has experienced substantial financial success, in contrast to the losses being experienced by many of the larger tire companies. In 1982, Mohawk had net earnings of $8.8 million on net sales of over $214 million.

Mohawk's stock is traded on the New York Stock Exchange. As of the record date for the 1983 annual meeting, there were 2,163,565 shares of Mohawk common stock outstanding divided among approximately 2600 shareholders. During 1982, Mohawk's shares traded at prices ranging from $15 ¼ to $25 ⅛ per share. During the second quarter of 1983, the market price of Mohawk's stock rose as high as $32 ¾ per share.

Because of Mohawk's success and the relatively small portion of stock controlled by management, the investment community has viewed Mohawk as an ideal takeover candidate. During 1982, while Mohawk's stock was trading for less than $25.00 per share, a number of investors considered Mohawk to be a profitable acquisition at prices as high as $32.00 per share. By December 1982, two separate investors had acquired significant blocks of Mohawk stock and filed Schedule 13D statements indicating that they sought to "seek out third parties who may be interested in acquiring the company." Early in 1983, Independence Holding Co. (Independence) emerged as Mohawk's principal suitor. In a schedule 13D filed on February 28, 1983, Independence

---

1. *See* 98 F.R.D. 478 (N.D.Ohio 1983).

disclosed that it owned 16.04% of Mohawk's common stock and was actively pursuing the possibility of forming some kind of combination with Mohawk.

In addition to these investors, senior Mohawk management received several expressions of interest from outside parties regarding an acquisition of Mohawk during 1982. Most of these expressions of interest involved leveraged buy-outs [2] of Mohawk, with senior management staying in control of the company and acquiring a substantial equity interest. Mohawk management considered the proposals but did not take any steps toward accepting and implementing any of these proposals.

Defendants Henry F. Fawcett and William T. Ernst are the principal executives of Mohawk. Fawcett has been an employee of Mohawk since 1946 and has held a variety of positions over the course of that career. Currently 63 years of age, Fawcett has been Chairman of the Board and chief executive officer of Mohawk since 1979 and owns approximately 2% of Mohawk's outstanding common stock. William Ernst has also been employed by Mohawk since 1946. He has held various positions in the corporation and has been Mohawk's president and chief operating officer since 1979. Currently 63 years of age, Ernst owns approximately .5% of Mohawk's outstanding stock.

Mohawk's Board of Directors, in addition to Fawcett and Ernst, includes five outside directors. Those directors are Charles W. Enyart, a director of the company since 1935; C. Blake McDowell, Jr., a partner in a law firm which does a substantial amount of Mohawk's legal work; Dr. Charles A. Sanders, the executive vice president of E.R. Squibb and Sons; Ralph T. Shipley, Fawcett's brother-in-law and a former vice president of The Timken Company; and William B. Saxbe, a former United States Senator and Attorney General of the United States. As a group, the outside directors have significant personal and business ties to the corporation. In recent years, the Board assumed a relatively passive role in supervising the corporation's conduct and frequently conducted its meetings informally.

■ The plaintiff in this case, Albert Fradkin, owns 1000 shares of Mohawk common stock.[3] Fradkin's capacity to prosecute this lawsuit was the subject of a motion to dismiss filed by defendants.[4]

B. *Executive Compensation for Fawcett and Ernst.*

During 1981, Fawcett and Ernst entered into lucrative long term employment agreements with Mohawk. The principal components of their compensation are a salary and a bonus based upon Mohawk's earnings. Historically, Ernst has received an annual bonus representing approximately 3% of Mohawk's earnings. Fawcett's bonus represents approximately 5% of Mohawk's earnings. For the year 1982, Fawcett and Ernst earned $607,125 and $444,608 respectively in salary and bonus. These employment agreements remain in effect, absent a termination for cause, for three years after notice of termination is given.

Fawcett and Ernst are covered by both Mohawk's Pension Plan for Salaried Em-

---

2. In a leveraged buyout, management of the company purchases the company's outstanding stock from the shareholders. An investment banker arranges the transaction and provides the capital for the purchase. Management stays in control of the company and eventually repays the debt to the investment banker and acquires an increased share of the company's stock. By definition, a leveraged buyout is a friendly transaction and depends upon the willingness of incumbent management to purchase the company's stock and to remain in control of the company's affairs for a period of time.

3. At the close of plaintiff's case, defendants moved for dismissal on the grounds that plaintiff had not proved that he was a shareholder on the record date for the annual meeting, February 16, 1983. While there is no direct evidence in the record that Mr. Fradkin held Mohawk shares on February 16, 1983, there is evidence that he held 1000 shares of Mohawk common stock in street name both before and after this date. The Court, therefore, finds that plaintiff held 1000 shares of Mohawk common stock on the record date and that the plaintiff has standing to bring this action.

4. *See* 98 F.R.D. 478 (N.D.Ohio 1983).

ployees and Mohawk's Supplemental Retirement Income Plan. Under the terms of the Pension Plan, Fawcett is entitled to receive a lifetime annuity (ten years certain) in the amount of $189,469.00 annually. Ernst would receive the same annuity in the amount of $131,269.00 annually. Fawcett and Ernst will also receive benefits under Mohawk's Supplemental Retirement Income Plan. These additional benefits are keyed to their salary and bonus during the five years preceding retirement and the consumer price index. If Fawcett and Ernst were to elect to receive these payments as life-time annuities [5] (ten years certain) beginning at age 65, the annual annuity to Fawcett would be $198,280.00 and to Ernst $142,552.00.

Since 1978, Fawcett and Ernst's compensation has also included a stock option plan. Fawcett earned profits of $132,132.00, and Ernst $89,942.00 upon the surrender and cancellation of stock appreciation rights (SARs) [6] relating to stock options granted them between 1978 and 1982. A stock option plan approved by Mohawk's Board of Directors in 1982 provided for an additional grant of stock options to Fawcett and Ernst, but limited the grant to stock valued at $100,000.00 per individual per calendar year. The Board terminated the 1982 Plan at the time it adopted the 1983 Plan.

C. *Development of 1983 Stock Option Plan.*

Mohawk's Board of Directors discussed the adequacy of the compensation available to Fawcett and Ernst under the 1982 stock option plan at the October 1982 Board meeting. At that time, the directors, particularly Dr. Sanders, expressed the view that the 1982 Plan provided inadequate benefits to Fawcett and Ernst. No official action was taken, but Ernst was directed to give this subject further consideration. Dr. Sanders reiterated his views in a December 1982 letter to McDowell.

After the October 1982 meeting, Ernst began work on what became the 1983 stock option plan (Plan). In drafting the Plan, he coupled the Board's desire for a more generous option plan with a mechanism for compensating Fawcett and himself in the event of a reorganization. This latter feature of the Plan, the reorganization premium,[7] originated with Ernst. The operation of the reorganization premium is discussed in the next section. The developing Plan went through a number of drafts in December 1982 and January 1983. Notably, the draft dated January 4, 1983, varies significantly from the Plan presented to the shareholders.[8]

D. *Terms of the 1983 Stock Option Plan.*

The Plan provided for grants to Fawcett and Ernst of both options and SARs in tandem with options on 200,000 shares of Mohawk common stock with Fawcett to receive options on 120,000 shares and Ernst to receive options on 80,000 shares. In total, these proposed grants represent 9.25%

---

**5.** Fawcett and Ernst also had the option to have the Supplemental Retirement Income Plan benefits paid over a four-year period beginning at age 65. If they had elected this option, Fawcett and Ernst respectively would have received $466,019.00 and $327,552.00 annually for a period of four years.

**6.** SARs are a recent development in executive compensation. They serve as a substitute for the grant and exercise of stock option rights. An executive exercising option rights to gain the benefit of an appreciation in the market price of the stock must borrow the money needed to exercise the options and purchase the stock. The executive must then sell the stock on the open market in order to receive any profit. SARs, on the other hand, short circuit this process by allowing a single payment by the corporation of the amount of ap-

preciation on the stock to the grantee. There is no purchase or sale of stock, yet the grantee receives the value of the appreciation in the stock.

**7.** The phrase "reorganization premium" does not appear in the Plan itself, but is a label adopted by the Court for ease of reference.

**8.** The most notable difference between the draft dated January 4, 1983, and the text of the Plan contained in the proxy statement is the addition of the "cap provision" to the calculation of the reorganization premium. The actual terms of this provision are discussed in the following section. The January 4, 1983, draft does not contain any mention of the cap provision. *Compare* Pl.Exh. 36 (Jan. 4, 1983 Draft) *with* Pl.Exh. 1 (1983 Proxy Statement).

of Mohawk's then outstanding common stock. Absent a change in control, and subject to the provisions of Exchange Act § 16(b) dealing with insider trading, this arrangement would allow Fawcett and Ernst to receive $200,000.00 for each dollar per share increase in the value of Mohawk's common stock above the exercise price of the options.

Under the terms of the Plan, the exercise price of the options was keyed to the market price on the day of the grant. The value of the options, therefore, was tied to the market price of Mohawk's shares on the day of the grant. As a result an increase in the market price of Mohawk shares prior to the grant would diminish the value of the options to Fawcett and Ernst.

The more complex provisions of the Plan related to the effect of a merger, consolidation, or other reorganization transaction [9] upon the granted options and SARs. Under the terms of the Plan, if any reorganization transaction took place, Fawcett and Ernst would be required to surrender all of their outstanding and unexercised options and SARs to the corporation. In exchange for that surrender, they would each receive, as the reorganization premium, a cash payment in an amount equal to the lesser of the per share consideration [10] (cap provision) or four times the difference between the per share consideration and the option price per share (multiplier provision).

The options were granted at $24.125 per share. The effect of setting the option price at this level was to place a "cap" on the option plan at $32.125 per share.[11] If a reorganization transaction should take place where the per share consideration was $32.125 per share or less, the multiplier provision of the option plan would control. If the per share consideration in a reorganization transaction were greater than $32.125, the capped provision would prevent the multiplier provision from applying.

The mechanics of the reorganization premium can be explained using a pair of examples. In the event that a reorganization transaction took place at a per share consideration of $32.00 per share, the options on the 200,000 shares held by Fawcett and Ernst would be worth $6.3 million. If the reorganization transaction took place at $35.00 per share, the options would be worth $7.0 million. The calculations involved in reaching these totals are set forth in the margin.[12]

9. Under the terms of the plan, this provision applies in the event of a merger or consolidation with any other corporation, sale of all or substantially all of the company's assets to any other corporation, or dissolution of the company. For ease of reference, both the Plan and this opinion refer to any of these events as a "reorganization transaction."

10. The Plan also contains a detailed procedure for calculating the "per share consideration." Proxy statement at 11. The details of this definition, however, are not in issue in this case.

11. At trial, testimony was presented to suggest that the cap came into effect at $32.00 per share. The Court's calculations suggest, however, that the cap goes into effect at $32.125 per share. Similarly, there was testimony that a reorganization transaction occurring at a per share consideration of $32.00 per share would be worth $6.4 million to Fawcett and Ernst, while the calculations in the next paragraph indicate that it would be worth only $6.3 million. Neither of these mathematical differences carries any significance with regard to the decision of this case.

12. *Where the market price is $32.00 per share.*
 (1) Calculate four times the difference between the per share consideration, or market prices ($32.00), and $24.125.
 $4 \times (\$32.00 - \$24.125) = \$31.50$
 (2) Determine the lesser of the per share consideration, or market price ($32.00), and this total ($31.50). In this case, $31.50.
 (3) Multiply this figure by the number of options and SARs involved:
 Fawcett 120,000 × $31.50 = $3,780,000
 Ernst 80,000 × $31.50 = $2,520,000
 Total 200,000 × $31.50 = 6,300,000
 *Where the market price is $35.00 per share.*
 (1) Calculate four times the difference between the per share consideration, or market price ($35.00) and $24.125.
 $4 \times (\$35.00 - \$24.00) = \$43.50$
 (2) Determine the lesser of the per share consideration, or market price ($35.00), and this total ($43.50). In this case, $35.00.
 (3) Multiply this figure by the number of options and SARs involved:
 Fawcett 120,000 × $35.00 = $4,200,000
 Ernst 80,000 × $35.00 = $2,800,000
 Total 200,000 × $35.00 = $7,000,000

Under the terms of the Plan, any options granted would be invalidated if the Plan failed to receive approval by the holders of the majority of the common stock present or represented and entitled to vote at the 1983 annual meeting. This approval requirement, which tracks the language of Exchange Act Rule 16b–3,[13] apparently was designed to qualify the Plan for the exemption to the short swing profit rules of § 16(b) of the Exchange Act.

E. *Events of January 4, 1983.*

On December 17, 1982, certain large shareholders of Mohawk filed an amended Schedule 13D indicating their intent to seek out other investors who might be interested in acquiring Mohawk. During the weeks that followed, the value of Mohawk's stock rose steadily. Near the close of 1982, Mohawk's stock stood at $25 ⅛ per share, its all time high. In Ernst's own words, Mohawk's stock "began a rapid run up of the price .... [W]e were concerned things might get out of hand." Tr. at 869.[14]

On January 4, 1983, sixteen days before the regularly scheduled Board of Directors meeting at which the Plan was to be presented, Ernst telephoned the Directors individually to obtain approval for the Plan. No prior written notice was given to the Directors, and the Plan was not before them in written form prior to the telephone calls. Throughout the day, Ernst called each Director individually and explained the Plan. At no time were all of the Directors on the phone at the same time, and only one call was placed to each Director.

During each conversation, Ernst explained the provisions of the Plan. The complete details of the Plan were not explained with all of the Directors. Ernst did not tell all of the Directors the number of options to be granted. Further, Shipley and Saxbe did not learn that there were SARs attached to the options. Also, Saxbe did not learn of the multiplier provision of the Plan until months later.

Each Director orally approved the Plan as described to him. However, the Plan that was ultimately presented to the shareholders was not in final form at the time of the January 4, 1983 phone calls. Most significantly, the capped provision to the calculations in the event of a reorganization transaction was not included in the draft of the Plan discussed on January 4, 1983.

■ During the phone calls, Saxbe, McDowell, and Sanders agreed to serve on the Option Committee. Their appointment to the Option Committee, however, was not discussed with the other Directors.[15] The

---

**13.** In relevant part, Rule 16 b–3 exempts certain transactions from the operation of Exchange Act § 16(b). These include:

the acquisition of shares of stock, except that stock acquired upon the exercise of an option, warrant or right shall be exempt only to the extent indicated in the final clause of this sentence; the acquisition, expiration, cancellation or surrender to the issuer of a stock option or stock appreciation right; the surrender or delivery to the issuer of shares of its stock as payment for the exercise of a stock option for shares of the same class; and the acquisition upon the exercise of a stock option of shares of stock equal to the number of shares of the same class surrendered or delivered to the issuer as payment for the exercise of the option. The conditions of this rule that a plan must satisfy in order for the above transactions to be exempt are as follows:

(a) Approval by security holders. The plan has been approved, directly or indirectly, (1) by the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer was incorporated, or

. . .

(b) Disinterested administrators.

. . . . . .

(c) Plan limitations.

. . . . . .

**14.** Plaintiff has produced some evidence that Ernst did not speak to Saxbe until January 5, 1983. The issue of whether the conversation between Saxbe and Ernst took place on January 4 or January 5, however, is not significant in the resolution of the issues before the Court.

**15.** Ohio Rev.Code § 1701.63(A), the provision authorizing the appointment of committees of the Board of Directors, provides for the creation of committees by action of the Directors. In this case, the appointment was not discussed by the other Directors. The option committee, therefore, was never properly appointed under Ohio law.

members of the Option Committee did not meet or speak with each other on January 4, 1983, nor did they take any action to grant options to Fawcett and Ernst on January 4, 1983.

Sometime after January 4, 1983, minutes of the "Board of Directors Meeting" and "Option Committee Meeting" were prepared. Those minutes outline the events of January 4, 1983, as if they had taken place in formal meetings. The minutes describe motions being made and seconded and debate taking place. While the minutes may describe the intent of the directors, they constitute a fictionalization of what might have happened had actual meetings taken place. The events of January 4, 1983, contained none of the procedures of a regular, formal meeting. To the extent, therefore, that the minutes suggest that a meeting took place in which regular procedures were followed, the minutes are inaccurate.

F. *Signing of the Option Agreements.*

Pursuant to the Plan, option agreements were prepared between Fawcett and Ernst and Mohawk. Those agreements state that they were signed by Fawcett, Ernst, and the members of the Option Committee on January 4, 1983. In fact, those agreements were signed at the January 20, 1983, regular meeting of the Mohawk Board of Directors. The Plan was not discussed at the January 20, 1983 Board meeting.

G. *Proxy statement.*

On March 7, 1983, Mohawk sent its shareholders a notice and proxy statement for the Annual Meeting of Shareholders scheduled for April 12, 1983. The proxy statement indicated that the two principal items of business scheduled to come before the meeting were a proposal to re-elect Ernst, McDowell and Saxbe as Directors and a proposal to adopt the Plan. In a letter to Mohawk's shareholders which accompanied the proxy statement, Fawcett and Ernst urged the shareholders to give prompt attention to the proxy and indicated that the Board of Directors unanimously recommended a vote for the Plan.

The proxy statement also contained a lengthy description of the Plan. The full text of that description is set out as appendix A of this opinion. In addition, the full text of the Plan itself was appended as an exhibit to the proxy statement.

H. *Events leading to preparation of a supplemental proxy statement.*

On March 17, 1983, representatives of Independence met with Fawcett and Ernst to discuss the Plan and the proxy statement, along with Independence's efforts to obtain a seat on Mohawk's Board of Directors. At that meeting, Independence's representatives advised Fawcett and Ernst that they viewed the proxy statement as misleading because of its failure to fully disclose all of the benefits payable to Fawcett and Ernst. On March 22, 1983, Independence filed an amendment to its Schedule 13D which stated that Independence did not intend to support the adoption of the Plan because the benefits payable under the Plan were "excessive." Independence further stated that it believed the Plan was not in the best interests of the corporation.

Subsequently, on March 25, 1983, this action was commenced. Plaintiff filed a verified complaint in this Court seeking, among other things, a preliminary and permanent injunction barring the submission of the Plan to a shareholders' vote at Mohawk's annual meeting. On March 30, 1983, Judge John Manos of this Court entered an Order allowing the vote to go forward, but enjoining Mohawk from taking any steps toward implementing the Plan pending a trial on the merits.

I. *Supplemental proxy statement.*

On April 2, 1983, ten days before the annual meeting, Mohawk issued a supplemental proxy statement. The statement addressed many of the issues raised by Independence's objections and this law suit. The full text of the supplemental proxy statement is set out as appendix B of this opinion. In any case, defendants do not rely on the disclosures contained in the supplemental proxy in the defense to plaintiff's cause of action.

At the time of the mailing of the supplemental proxy statement, proxies represent-

ing 855,099 shares (39.5%) of Mohawk's outstanding common stock had already been received. Of those shares, 780,177 had voted in favor of the Plan, 61,791 had voted against the Plan, and 13,131 had abstained. The supplemental proxy statement was not mailed to any of these shareholders.

The supplemental proxy statement was sent to the remaining 1,187 record holders of Mohawk common stock, representing 1,308,466 (60.5%) shares. With respect to shares held by brokers in "street name," [16] for the beneficial owners, the supplemental proxy statement was mailed too late to allow the brokers to mail the statement to the beneficial owners of the shares before the annual meeting. A substantial number of Mohawk shareholders, including Saxbe and Sanders, never received the supplemental proxy statement.

J. *Annual meeting of April 12, 1983.*

On April 12, 1983, Mohawk's annual meeting of shareholders was held. Holders of 1,821,113 shares (84.17%) of Mohawk common stock were represented at the meeting for quorum purposes. The election of directors was held in accordance with a demand for cumulative voting. F. Peter Zoch, III, Independence's President, was elected to Mohawk's Board of Directors along with Ernst and McDowell. Saxbe was not reelected.

16. The phrase "street name" refers to:
securities held in the name of a broker instead of his customer's name.... This occurs when the securities have been bought on margin or when the customer wishes the security to be held by the broker. The name of a broker or bank appearing on a corporate security with *blank endorsement* by the broker or bank. The security can then be transferred merely by delivery since the endorsement is well known. Street name is used for convenience or to shield identity of the true owner.

With respect to the vote on the Plan, proxies representing 312,321 shares were not voted. These were shares held in street name by brokers for the beneficial owners of the shares. Pursuant to New York Stock Exchange rules, the brokers, who had not received specific instructions from the beneficial owners of the shares with regard to voting on the Plan, were unauthorized to cast votes on the Plan.[17] Many of the brokers physically struck the proposal relating to the Plan from the proxy or otherwise indicated that they were not entitled to vote on that proposition.

In the vote on the Plan, the shares were voted as follows:

| | No. of Shares Voted |
|---|---|
| For the Plan | 807,661 |
| Against the Plan | 679,160 |
| Abstained | 20,457 |
| Street Names | 312,321 |
| Absentees | 343,996 |
| Total Outstanding Shares | 2,163,565 |

The parties dispute whether the absentee and street names shares should be considered in determining whether this distribution of shares represents majority approval of the Plan. The following percentages are obtained for each of the potential permutations:

Black's Law Dictionary 1274 (5th ed. 1979).

17. New York Stock Exchange Rule 452.12 provides that a broker "may not give a proxy to vote without instructions from beneficial owners when the matter to be voted upon authorizes issuance of stock or options to purchase stock, to directors, officers, or employees in an amount exceeding 5% of the total amount of the class outstanding." The Plan clearly falls within the prohibition of this Rule.

| | All shares outstanding | Excluding street names | Excluding absentees | Excluding absentees & street names |
|---|---|---|---|---|
| For the Plan | 37.33% | 43.63% | 44.39% | 53.58% |
| Against the Plan | 31.39 | 36.69 | 37.32 | 45.06 |
| Abstained | 0.94 | 1.11 | 1.12 | 1.36 |
| Street Names | 14.44 | XX | 17.17 | XX |
| Absentees | 15.90 | 18.57 | XX | XX |
| | 100.00% | 100.00% | 100.00% | 100.00% |
| Shares Considered | 2,163,565 | 1,851,244 | 1,819,599 | 1,507,278 |

The inspector of elections certified the results of the election and signed a certificate indicating that the Plan was duly approved.[18]

### K. Events following the annual meeting.

At the May, 1983, meeting of the Board of Directors, Fawcett and Ernst presented a document entitled "Approval of Directors of the Mohawk Rubber Company to Action Without a Meeting" to the Directors. The document, which was designed to cure the Board's failure to have a formal meeting on January 4, 1983, was signed by all of the pre-annual meeting directors, including Saxbe.[19] The new Director, F. Peter Zoch, III, did not sign the document. A similar document entitled "Approval of Option Committee of the Directors of the Mohawk Rubber Company to Action Without a Meeting" was also signed by Sanders, McDowell and Saxbe on or about May 19, 1983. That document was designed to cure the failure of the Option Committee to hold a formal meeting on January 4, 1983.

### III. DISCUSSION

■ Jurisdiction in this case is not in dispute. Federal district courts have exclusive jurisdiction for violations of the securities laws. Exchange Act § 27. The private right of action for violations of § 14(a) of the Securities Act was recognized by the Supreme Court in *J.I. Case Company v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The remaining state law claims are properly before the Court under this Court's pendent jurisdiction because they arise out of the same nucleus of operative facts as the federal securities action. Personal jurisdiction and venue are proper in this Court because Mohawk has its principal place of business within the Northern District of Ohio.

■ This action is properly maintainable as a shareholder's derivative action and as a class action. Fradkin was a Mohawk shareholder at the time all of the relevant events in this litigation took place. The action was not brought collusively to confer jurisdiction upon the Court. Although plaintiff made no demand on Mohawk's Board to commence this action, such a demand would have been futile.[20] See *Leff v. CIP Corp.*,

18. Defendants have cited Ohio Rev.Code § 1701.50(E) as giving special significance to this certificate. That statute provides that the "certificate of the inspectors shall be prima-facie evidence of the facts stated therein and of the vote as certified by them." The Court will grant prima-facie weight to the vote totals reported on the certificate, but not to the statement that the Plan was approved. Such a statement is a legal conclusion, not a factual determination, and thus is a matter for decision by the Court, not the inspectors.

19. At this time, Saxbe had been replaced on the Board of Directors. He was not present at this meeting, and his signature was obtained at a later date.

20. In the amended complaint, plaintiff alleges that:

A demand by plaintiff on the directors of the Company to bring this action on behalf of the Company would be futile because all of the directors at the time of the purported

540 F.Supp. 857, 868–69 (S.D.Ohio 1982). The Court's analysis of the remaining requirements for maintaining this suit as a class action and as a shareholders' derivative action is set forth in this Court's earlier order.

The Court will now turn to the four counts set forth in plaintiff's amended complaint. The Court will begin its analysis with a consideration of the counts seeking a declaratory judgment that the Plan was not approved at the Annual Meeting. The Court will next turn to the count alleging that the proxy statement violated § 14(a) of the Exchange Act and Exchange Act Rule 14a–9. In light of the Court's analysis of these counts, the Court need not reach the corporate waste count of the complaint.

## A. APPROVAL OF THE PLAN.

As a threshold matter, the Court must consider whether the Plan was approved by the shareholders' vote at the annual meeting. The parties do not dispute the final vote totals from the meeting. The parties dispute, however, the applicable standard for determining whether such a vote represents approval of the Plan.

Two separate standards must be considered—the terms called for by the Plan and Mohawk's Code of Regulations. By its terms, the Plan states that it will terminate if it is "not approved by the holders of the majority of the common stock of the Company present, or represented, and entitled to vote at said annual meeting. . . ." This standard tracks the language of Exchange Act Rule 16b–3,[21] the exemption from the short-swing liability provisions of § 16(b). Article I, section 6 of Mohawk's Code of Regulations, however, provides that:

> Any contract, act, or transaction, prospective or past, of the company, or of the

Board, or of the officers may be approved or ratified by the affirmative vote at a meeting of the shareholders, or by written consent, with or without a meeting, of the holders of shares entitling them to exercise the majority of the voting power of the company, and such approval or ratification shall be as valid and binding as though affirmatively voted for or consented to by every shareholder of the company.

Plaintiff contends that the Plan failed to receive the required approval under both of these standards.

The parties agree that 807,661 shares voted for the Plan. They disagree, however, regarding the number of shares which should be included in the applicable pool of outstanding shares for purposes of determining whether this vote represents majority approval. The dispute focuses on whether shares not present at the meeting or held in street name should be considered in this pool. Given the vote totals at the meeting, both the absentee and street name shares must be excluded from the pool in order for the Plan to have received a majority affirmative vote. The Court will address these two classes of shares in the context of each of the applicable standards.

1. *Majority standard in the Plan.*

█ Under the terms of the Plan, approval is required of a majority of the stock "present, or represented, and entitled to vote." Under the language of this provision, shareholders who did not submit proxies are not included in the pool because they were not "present" at the meeting. Further, the shares held in street names were ineligible to vote on the Plan and must also be excluded from the pool. Under this analysis, the Plan received 53.58% of the shares present and eligible to vote. There-

---

adoption of the Option Plan and issuance of the Proxy Statement are defendants; and they are all alleged to have committed violations of federal and state law for which they are accountable to the Company and to the class; so that the directors of the Company have irreconcilable conflicts of interest which render them incapable of considering objectively whether it is in the Company's best interest to pursue this litigation.

*Id.* at ¶ 89. The testimony presented by plaintiff at trial supported this allegation, and no conflicting testimony was offered by defendants. Accordingly, the Court concludes that a demand on Mohawk's Board would have been futile.

**21.** *See* note 13, *supra,* for text of Rule 16 b–3.

fore, the Plan was approved by the shareholders under the terms specified by the Plan.

2. *Majority provision of the Code of Regulations.*

Pursuant to Article I, section 6 of Mohawk's Code of Regulations, an act of the Board of Directors "may be approved or ratified by the affirmative vote ... of the holders of shares entitling them to exercise a majority of the voting power of the company ...." Two disputes regarding the construction of this provision separate the parties. Again, the parties dispute the appropriate number of shares to be included in the pool of outstanding shares. The parties also dispute the construction of the word "may."

■ Upon review of the language contained in the Code of Regulations, the Court concludes that those shares eligible to vote, but not present at the meeting, cannot be excluded from the pool. The Code of Regulations speaks in terms of voting power of the corporation; it makes no reference to a shareholder's presence at the meeting. Accordingly, the Court concludes that the Plan received an affirmative vote of no more than 43.63% of the pool, and therefore, the Plan failed to receive a majority affirmative vote.[22]

■ Defendants attempt to avoid this conclusion by arguing that the import of the word "may" in the Code of Regulations is permissive, not mandatory. According to defendants, the Code of Regulations allows the defendants to set a different standard for approval of the Plan. However, Article I, section 6 of the Code of Regulations begins with the phrase "Except as otherwise provided by the amended articles of incorporation or by law." Given this limitation, the corporation may not change the majority vote requirement set forth in the Code of Regulations without amending the Code of Regulations or the Articles of Incorporation. Defendants' argument, therefore, is not well taken.[23]

The Court, therefore, concludes that the Plan did not receive the requisite majority affirmative vote required by Mohawk's Code of Regulations. As the provisions of the Code of Regulations control the conduct of the corporation, the Court concludes that the Plan was not approved by the shareholders. Accordingly, the Court grants declaratory judgment for the plaintiff and against defendants on plaintiff's claim that the Plan was not approved under the provisions of the Code of Regulations.

## B. VIOLATIONS OF EXCHANGE ACT § 14(a) AND EXCHANGE ACT RULE 14a–9.

Plaintiff contends that Mohawk's March 1983 proxy statement was materially misleading in violation of the laws regulating the solicitation of proxies. In relevant part, § 14(a) of the Exchange Act provides:

It shall be unlawful for any person, ... in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit ... any proxy....

Because § 14(a) does not, by itself, proscribe any conduct, but solely serves to delegate that authority to the SEC, it is the SEC rules which set the applicable legal standard in this area. Pursuant to the authority granted in § 14(a), the SEC has promulgated Exchange Act Rule 14a–9. In relevant part, that rule provides:

**22.** Defendants cite *Cunnigham v. Ilg,* 118 Neb. 682, 226 N.W. 333 (1929), as authority on the eligibility of the various classes of shareholders. That case involved the treatment of voters who were legally ineligible to vote on the issue before the meeting. It did not, however, relate to the treatment of voters who were absent from the meeting.

**23.** A better construction of the Code of Regulations language is to view the word "may" as allowing, but not requiring, approval or ratification of corporate action by the shareholders. Under this construction, the Board may act without presenting their action to the shareholders. Where the Board does present the action to the shareholders, however, the approval standard contained in the Code of Regulations is mandatory, not permissive.

No solicitation ... shall be made by means of any proxy statement ... containing any statement which, at the time and in light of the circumstances under which it was made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading
....

Over the years, the Supreme Court has adopted a liberal interpretation of both of these provisions in order to implement the broad remedial purposes of the Exchange Act. *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 444, 96 S.Ct. 2126, 2130, 48 L.Ed.2d 757 (1976); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970).

Three separate legal issues are raised by plaintiff's cause of action under Rule 14a–9. In considering the plaintiff's cause of action under Rule 14a–9, it is necessary to address the separate questions of causation, the applicability, if any, of a scienter requirement, and the standard for determining whether any misstatements or omissions in a proxy statement are sufficiently "material" to constitute a 14a–9 violation.

### 1. *Causation.*

█ The causation requirement in a 14a–9 action was discussed by the Supreme Court in *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). In that case, the Court reversed a Seventh Circuit Court of Appeals decision which required a plaintiff to demonstrate that a defect in the proxy statement actually had a decisive effect on the voting. Instead, the Court ruled that:

Where there has been a finding of materiality, shareholder has made a sufficient showing of causal relationships between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.

*Id.* at 384–85,[24] 90 S.Ct. at 622. In this case, the plan, by its terms, required shareholder approval. The solicitation of proxies, therefore, was "an essential link in the accomplishment of the transaction." Accordingly, if the proxy statement contains a material misstatement or omission, the causation requirement is met.

### 2. *Scienter requirement.*

Defendants argue that plaintiff must show that they acted with scienter in order to prove their claim under Rule 14a–9. While the Supreme Court has imposed a scienter requirement in the context of the private right of action under Rule 10b–5, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the issue remains unresolved in the context of the Rule 14a–9 cause of action.[25]

The leading case on the scienter requirement in a 14a–9 action brought against a corporate defendant is *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281 (2d Cir.1973). The Court relied on the differences between the statutory authorization for Rules 10b–5 and 14a–9 to suggest that the scienter requirement under Rule 10b–5 need not be extended to Rule 14a–9. *Id.* at 1298–99. Further, the Court found that general principles of tort law indicated that where "the transaction redounded directly to the benefit of the defendant, ... the common law

---

**24.** This is not a case where management controlled a sufficient number of shares to approve the transaction without any votes from a minority. The Court, therefore, need not consider the Supreme Court's suggestion that a different causation requirement applies to such a situation. 396 U.S. at 385 n. 7, 90 S.Ct. at 622 n. 7.

**25.** Defendants cite two cases for the proposition that the scienter requirement evolved in cases litigated under § 14(e) should be extended to actions brought under Rule 14a–9. *See*

*Adams v. Standard Knitting Mills, Inc.,* 623 F.2d 422, 430 (6th Cir.1980); *Resource Exploration v. Yankee Oil & Gas, Inc.,* 566 F.Supp. 54 (N.D.Ohio 1983), (Bell, J.) (Order denying motion for preliminary injunction). Both of these cases involved corporate mergers. While the analogy between § 14(e) and Rule 14a–9 may make sense in the context of a proxy statement describing a corporate merger, it is of less relevance in a situation where a proxy statement relates to a stock option plan, not a merger.

would provide the remedies of rescission and restitution without proof of scienter." *Id.* at 1300. Further, the Court concluded that "a broad standard of culpability ... will serve to reinforce the high duty of care owed by a controlling corporation to minority shareholders in the preparation of a proxy statement ...." *Id.* The Court, therefore, held that when the plaintiffs "are seeking compensation from the beneficiary who is responsible for the preparation of the [proxy] statement, they are not required to establish any evil motive or even reckless disregard of the facts. *Id.* 478 F.2d at 1300–01. Liability would be imposed upon individuals who "merely negligently drafted" a proxy statement. *Id.* at 1301 n. 20

The Sixth Circuit addressed the issue of a Rule 14a–9 scienter requirement in a slightly different context in *Adams v. Standard Knitting Mills, Inc.,* 623 F.2d 422 (6th Cir. 1980). In that case, the Sixth Circuit reversed a judgment assessing damages against a firm of certified public accountants for the negligent preparation of a proxy statement used to obtain shareholder approval of a merger. In that case, the Court concluded that "scienter should be an element of liability in private suits under the proxy provisions as they apply to outside accountants." 623 F.2d at 428. The Court distinguished the scienter requirements for outside accountants and corporate issuers. *Id.* at 428. Reviewing the legislative history of the Exchange Act, the Court found that the principal concern of the drafters of the proxy rules was that of "corporate officers using the proxy mechanism to ratify their own frauds upon the shareholders." *Id.* at 429. The critical distinction, therefore, is that

> the accountant here, unlike the corporate issuer, does not directly benefit from the proxy vote and is not in privity with the stockholder.... Federal courts ... have a special responsibility to consider the consequences of their rulings and to mold liability fairly to reflect the circumstances of the parties.... The preparation of financial statements to be appended to proxies and to other reports is the

daily fare of accountants, and the accountant's potential liability for relatively minor mistakes would be enormous under a negligence standard.

*Id.* at 428. The Court, therefore, distinguishing between outside accountants and the corporate issuer, imposed a scienter requirement in a private action brought under Rule 14a–9 against outside accountants.

In light of these authorities, the Court must now consider the applicability of a scienter requirement to the corporate issuer under Rule 14a–9. While the leading cases apply a negligence standard to corporate insiders, the Sixth Circuit has imposed a scienter requirement for finding outside accountants liable under Rule 14a–9. The issue, therefore, is whether the Court should distinguish between the scienter requirement imposed in the context of corporate issuers and outside accountants under Rule 14a–9 or whether the Court should extend the scienter requirement for outside accountants developed in *Adams* to a case involving a corporate issuer.

■ Upon review, the Court concludes that a distinction between the liability of a corporate issuer and outside accountants is appropriate, and a negligence standard should apply to the corporation issuing the proxy statement. Where the *Gerstle* court concluded that a negligence standard would be appropriate where the "transaction redounded directly to the benefit of the defendant," 478 F.2d at 1300, the *Adams* court imposed a scienter requirement where the outside accountant "does not directly benefit from the proxy vote," 623 F.2d at 428. In the Court's view, these two precedents are harmonious. Where the defendant is the corporate issuer, and the corporate officials are responsible for drafting the proxy statement, the *Gerstle* negligence standard applies, but not the *Adams* scienter requirement. As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard.

3. *Materiality of the alleged misstatements and omissions.*

In light of the foregoing analysis, the key issue in this case is whether the proxy statement contains a statement which is false or misleading with respect to a material fact. The Supreme Court provided a definition of materiality in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). In that case, the Court stated:

> An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote ... it does not require proof of the substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote. What the standard does contemplate is the showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investors having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2132. The Court further stated that "in view of the prophylactic purposes of the Rule and the fact that the content of the proxy statement is within management's control, it is appropriate that [any] doubt be resolved in favor of those the statute is designed to protect." *Id.* at 448, 96 S.Ct. at 2132. *See also Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970).

■ In applying this standard, the appropriate point of view is that of the reasonable investor, not the sophisticated analyst. It is "not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts." *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1297 (2d Cir.1973). On the other hand, "[s]ome information is of such dubious significance that insistence on its disclosure may accomplish more harm than good." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 448, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). "Reasonable latitude in this area is important if nit-picking is not to become the name of the game." *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 267 (3rd Cir.1972). *See also Ash v. LFE Corp.,* 525 F.2d 215 (3rd Cir.1975).

■ The issue of the materiality of any misstatement or omission is one of fact, not law. In *TSC Industries,* the Supreme Court stated that:

> The issue of materiality may be characterized as a mixed question of law and fact ... the determination requires delicate assessments of the inference a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly one for the trier of fact.

*Id.* 426 U.S. at 450, 96 S.Ct. at 2132–2133. The Court's analysis of the various alleged misstatements and omissions, therefore, represents additional fact findings and is presented in this section of the opinion solely for purposes of clarity.

In light of these standards, the Court will now individually analyze the materiality of the alleged misstatements or omissions in the proxy statement.

a. *The January 4, 1983 Board Meeting.*

In relevant part, the proxy statement states that:

> The Board of Directors, at its meeting of January 4, 1983, adopted, and directed to be submitted to the shareholders of the Company for their approval, the 1983 Non-Qualified Stock Option Plan....

Proxy statement at ¶ 1.[26] Plaintiff contends that this disclosure is materially false or misleading. Defendants have presented a two-tiered defense. Defendants argue that the disclosure, while not precisely accurate, accurately represents the effect of what happened on January 4, 1983. Alter-

---

**26.** The paragraph references are to the text of the Plan as set out in Appendix A of the opinion. Paragraph numbers are supplied by the Court for ease of reference.

natively, defendants argue that to the extent the proxy statement is inaccurate, that inaccuracy does not meet the standard for materiality under Rule 14a-9.

Defendants do not argue that the Board of Directors met in a typical formal meeting on January 4, 1983. Nor do defendants argue that the events of January 4, 1983, represent a telephonic meeting of the Board of Directors pursuant to Ohio Rev.Code § 1701.61(B-C).[27] Defendants argue, however, that the gravity of any procedural irregularities is reduced because the Board's activities of January 4, 1983, constituted valid corporate action and the individual directors' unanimously approved the Plan.

■ Upon review, the Court finds defendants have cited two cases in which Ohio Courts have refused to invalidate corporate action because of procedural irregularities. *See In re B–F Building Corp.*, 284 F.2d 679 (6th Cir.1960); *Piening v. Titus, Inc.*, 113 Ohio App. 532, 179 N.E.2d 374 (1960). Both of these cases, however, are factually distinguishable from this case. In both of these prior cases, the Court's rulings were limited to a statement that a corporation could not invalidate its own agreements with third parties because of a failure on the part of the corporation to follow appropriate procedures. As such, the cases stand for the proposition that a corporation is estopped from invalidating its actions because of procedural defects where an outside party has relied on the appearance of proper corporate action. In this case, the roles are reversed. The parties who rely on the procedurally defective corporate action are corporate insiders and the party seeking to invalidate the corporate action is an outside party. The Court, therefore, concludes that this case is distinguishable from *B–F Building* and *Piening* and that the events of January 4, 1983, do not qualify as valid corporate action in the context of this litigation.

■ The Court also finds defendant's argument that the unanimous approval of the Directors of the Plan cures any procedural defect that took place not well taken.

It is fundamental that officers of boards can act as a board only when assembled as a board, and by deliberate and concerted action dispose of the issue under consideration [and] that they cannot act in an individual capacity outside of a formal meeting . . . .

*2 W. Fletcher, Encyclopedia of Corporations* § 392 (1982). Procedural regularities and interaction among board members, therefore, are critical in determining the legitimacy of board of directors' actions. Absent such procedural regularities, a board may not act on behalf of a corporation. Where, as here, the Board has not met and acted as a board, the individual assent of the Board members will not serve as a substitute for these procedural regularities.

■ Having concluded that the events of January 4, 1983 did not constitute valid action of the Board of Directors under Ohio law and that the Director's unanimous approval of the Plan did not cure this procedural defect, the Court must now consider the accuracy of the disclosure made in the proxy statement. The proxy statement gives every indication that the Board took valid, formal action on January 4, 1983. As such, the proxy statement is false and misleading to the extent that it suggests that valid formal action took place. The only issue remaining before the Court, therefore, is whether the false and misleading disclosure in the proxy statement is sufficiently material to constitute a 14a-9 violation.

The materiality of a false or misleading disclosure regarding the actions of a corporate board or committee was considered in *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62 (D.C.Cir.1980); *cert. denied sub nom. Kalmanovitz v. SEC*, 449 U.S. 1012, 101 S.Ct.

27. Although Ohio will recognize a telephonic Board of Directors' meeting pursuant to Ohio Rev.Code § 1701.61(B), the events of January 4, 1983, do not constitute such a meeting. The statute requires that "all persons participating can hear each other" if the meeting is conducted by telephone. Further, written notice of the time and place of the meeting was not supplied to the Directors as required by Ohio Rev.Code § 1701.61(C). Neither of these requirements are met by the events of January 4, 1983.

569, 66 L.Ed.2d 471 (1980). That case involved a proxy statement which referred to an audit committee. In fact, the audit committee never met or functioned. The District Court concluded that the mention of the audit committee in the proxy statement "created the false impression that the board of directors was exercising careful oversight of the company's finances." *Id.* 629 F.2d 1 at 75. The Court of Appeals affirmed, stating:

> The existence of a committee implies a structured investigation and analysis of a company's fiscal welfare. Informal procedures may be adequate, but formal entities such as committees create at least the impression of great care and precision through detailed review and oversight. Stating that an audit committee, with its implication of careful oversight, existed when it did not thus is misleading. . . .

*Id.* The Court, therefore, concluded that this disclosure in the proxy statement was false and misleading in violation of Rule 14a–9.

■ Upon review, the Court finds the *Falstaff* Court's reasoning persuasive. In this case, the disclosures warrant a reasonable investor to believe that the Board of Directors had taken formal action and given deliberate consideration of the Plan. To the contrary, there was very little oversight and no discussion of the Plan by the Board of Directors. Given the public prominence of the Directors, a reasonable investor would consider the approval of the Board important in determining how to vote on the Plan. The Court, therefore, finds that the disclosures regarding the Board of Director's actions are materially false and misleading.

*b. The January 4, 1983 Actions by the Option Committee.*

With respect to the actions taken by the option committee on January 4, 1983, the proxy statement indicates:

> the Option Committee on January 4, 1983, granted Options and related SARs on 120,000 shares to Henry M. Fawcett and on 80,000 shares to William T. Ernst.

Proxy statement at ¶ 2. Plaintiff contends that this statement is materially false and misleading. In defense, defendants again attempt to limit the extent of the inaccuracy in the proxy statement. Alternatively, defendants argue that any inaccuracy in the proxy statement does not meet the standard of materiality under Rule 14a–9.

With respect to the accuracy of the disclosures regarding the option committee, defendants make two arguments. Defendants argue that, under the terms of the Plan, no meeting was required for the option committee to grant the options. In addition, defendants argue that the proxy statement never states that a meeting took place. The Court will analyze each of these contentions separately.

Defendants properly state that the Plan does not require that the option committee meet in order to grant options. Ohio Rev. Code § 1701.63(D), the provision authorizing and regulating the conduct of Board of Directors Committees limits the authority of such committees to actions taken "by a majority of its members at [a] meeting or by a writing or writing signed by all of its members." Subsection (E) of this provision authorizes the conduct of committee business by telephone, but only if all the participants may hear each other. Under these provisions, there can be no question that the option committee did not grant options on January 4, 1983. At the earliest, the options were granted on January 20, 1983, when the members of the option committee signed the option agreements.

■ Defendants' assertion that the proxy statement makes no representation that the option committee met, while true, does not save the proxy statement from further scrutiny. The proxy statement indicates to the reasonable investor that an option committee, consisting of three disinterested and widely respected members of the Board of Directors, gave deliberate consideration to the grant of options under the Plan. In fact, there is no evidence in the record that these individuals gave any consideration to granting the options. At most, they agreed to serve on an option

committee, not to act as an option committee. Moreover, the option committee was not properly appointed by the Board of Directors. *See* note 15, *supra.*

In light of these facts, and the reasoning presented in *Falstaff,* the Court finds that the disclosures in the proxy statement regarding the actions of the option committee are materially false and misleading. The proxy statement's implication that an independent option committee gave careful consideration to the grant of options under the Plan is untrue. There is a substantial likelihood that a reasonable investor would consider the actions of the option committee important in deciding how to vote on the Plan.

*c. Compensation payable to Ernst and Fawcett Outside the Plan.*

Plaintiff contends that the proxy statement's disclosures regarding the compensation payable to Ernst and Fawcett are materially false or misleading in four separate respects. Plaintiff argues that the Plan inadequately discloses the pension benefits payable to Fawcett and Ernst, that the proxy statement fails to disclose that Ernst and Fawcett have historically received substantial bonuses tied to Mohawk's earnings, that the proxy statement misstates the expiration date of Ernst and Fawcett's employment contracts, and that the proxy statement is misleading because of its failure to present the total compensation payable to Ernst and Fawcett in an understandable manner.

Before turning to the specific disclosures in the proxy statement, it is important to consider the materiality, in general, of disclosures regarding existing compensation in a shareholder's consideration of an option plan which would increase that compensation. The proxy statement itself states that "the 1983 Plan was designed specifically . . . to compensate Messrs. Fawcett and Ernst for their more than 35 years of dedicated service to the company and to provide them with a strong incentive to remain with the company. . . ." Proxy statement at ¶ 3. The Plan was thus presented to the shareholders on the basis that additional compensation for Fawcett and Ernst was warranted. A shareholder seeking to evaluate that presentation is entitled to full and accurate information regarding the existing compensation payable to Fawcett and Ernst. A reasonable shareholder considering such a Plan might be expected to ask questions like "What is Fawcett and Ernst's current compensation?" and "Given this existing compensation structure, and the role of Fawcett and Ernst in Mohawk's success, is the additional compensation envisioned by the plan warranted?" Under this analysis, therefore, full and accurate disclosures regarding the compensation payable to the proposed recipients are essential.

*i. Pension Benefits Payable.*

At no point in the proxy statement is there any specific disclosure of the pension benefits actually payable to Fawcett and Ernst. In its place, the proxy statement contains a generalized description of the pension benefits payable to all salaried employees.[28] Most importantly, the disclo-

28. In full text, the proxy statement made the following disclosure:

PENSION PLANS

The Company's Pension Plan for Salaried Employees provides non-contributory benefits based on an employee's years of service using the higher either of the benefits provided by the employee's career average earnings or the highest consecutive five-year average annual compensation during the ten years preceding retirement. Compensation for pension purposes includes salary and 75% of any profit sharing bonus. Benefits are limited to the extent required by the Employee Retirement Income Security Act of 1974 (ERISA) and the Tax Equity and Fiscal Responsibility Act (TEFRA) but the Company has implemented under the Company's non-qualified Supplemental Retirement Income Plan for Salaried Employees (the "Supplemental Retirement Plan") a plan to provide benefits in excess of these limitations if such excess benefits would otherwise have been provided under the Company's Pension Plan for Salaried Employees. Similarly, 25% of profit bonuses, in the case only of employees whose bonuses exceed twice their salaries, is included in the Supplemental Retirement Plan.

sure contains a chart which indicates the highest pension benefit payable to an individual is $240,850.00. In fact, had Fawcett retired on March 31, 1983, he would have been eligible to receive at age 65 a pension of $387,749.00 annually (10 years certain). Ernst's pension would have totaled $273,-821.00 under the same terms. *See* note 5 and accompanying text, *supra*. To the extent that the proxy statement makes disclosures regarding the pension benefits, those disclosures are incomplete and presented in an unnecessarily confusing and misleading manner. A reasonable investor could not calculate the actual figures payable from the information disclosed.[29] Further, such an investor would almost surely grossly underestimate the actual benefits payable.

Given Fawcett and Ernst's age, their future pension benefits are an unusually important part of their compensation. The Court holds that these pension benefits would be of substantial importance to a reasonable investor considering how to vote on the Plan. Accordingly, the Court finds that the disclosures regarding the pension plan benefits payable to Fawcett and Ernst are materially false and misleading.

*ii. Bonuses payable to Ernst and Fawcett.*

The proxy statement fully and properly discloses the total salary and bonus payable to Ernst and Fawcett. It does not, however, disclose that the bonus is directly related to Mohawk's earnings. Historically, that bonus has reflected 5% of Mohawk's net earnings for Fawcett and 3% for Ernst. In recent years, that bonus has far exceeded Fawcett and Ernst's salaries. Plaintiff contends that the failure to disclose this information in the proxy statement renders the proxy materially false and misleading.

■ Upon review, the Court finds that this omission does not render the proxy materially false or misleading. The proxy contains the aggregated information re-

The Supplemental Retirement Plan provides to employees in the year of vesting, an annual benefit equal to one-half the average annual compensation for the highest two consecutive years of the five years preceding retirement, such benefit to be paid for a period of time ranging from one year, for employees with a continuous service record of 32 or 33 years, to four years for employees with a continuous service record of 38 or 39 years. In lieu thereof, the employee may elect to receive an annuity equal to the present value of the previously described payments. The following table shows estimates of the annual benefits on a single-life basis payable to sala-ried employees, including officers, upon normal retirement based on final average earnings. In some cases, benefits on a career average basis may exceed final average earnings. Included in the columns for years of service 35 and 40 are benefits payable under the Supplemental Retirement Plan expressed as annuity payments. At present, the following executive officers have been employed by the Company for the number of years indicated after their names: William T. Ernst—37; Henry M. Fawcett—37; Russell L. Mulvey—14; Terry C. Hill—13; Paul E. Nicholson—32.

| Highest Consecutive Five Year Accrued Compensation of Last Ten Years of Employment | Years of Service | | | | | |
|---|---|---|---|---|---|---|
| | 15 | 20 | 25 | 30 | 35 | 40 |
| $ 50,000 | $ 9,180 | 13,350 | 17,520 | 21,680 | 27,050 | 31,560 |
| 100,000 | 21,680 | 30,020 | 38,355 | 46,680 | 57,420 | 66,440 |
| 150,000 | 34,180 | 46,690 | 59,155 | 71,680 | 87,790 | 101,320 |
| 200,000 | 46,680 | 63,360 | 80,030 | 96,680 | 118,160 | 136,200 |
| 250,000 | 59,180 | 80,030 | 100,870 | 121,680 | 148,530 | 171,080 |
| 300,000 | 71,680 | 96,700 | 121,705 | 146,680 | 178,900 | 205,960 |
| 350,000 | 84,180 | 113,350 | 142,520 | 171,680 | 209,300 | 240,850 |

**29.** The proxy statement states that one method for calculating the benefits payable under Mohawk's Pension Plan for Salaried Employees is based upon "the highest consecutive five-year average annual compensation during the ten years preceding retirement." Proxy statement at 5. In light of this provision, data on Fawcett and Ernst's compensation for at least the prior ten years would be required to make a calculation of their pension benefits under this Plan. This data was not contained in the proxy statement, and therefore, an investor, no matter how inquisitive, could not calculate the actual figures from the information disclosed in the proxy statement.

garding the amount of salaries and bonus. The breakdown between salary and bonus would not provide significant new information for a shareholder. At most, such information would indicate the volatility of the compensation payable to Fawcett and Ernst. The Court finds, however, that a reasonable shareholder would not find this generalized indicator of the volatility of their combined salary and bonus sufficiently important that the omission rises to the level of materiality required under Rule 14a–9.

### iii. Expiration date of employment contracts of Fawcett and Ernst.

The proxy statement indicates that Fawcett and Ernst are employed under contracts expiring December 31, 1985. Proxy statement at 4. In fact, however, the employment contracts require that, except for a termination of cause, Mohawk must give three years' notice before terminating either Fawcett or Ernst's employment contract. As notice had not been given at the time of trial, those employment contracts run until at least June, 1986. In this respect, therefore, the proxy statement is inaccurate.

 As defendants properly note, however, some omissions are so trivial as to be beyond the scope of the securities laws. This omission falls into that class. Accordingly, the Court finds that the failure to disclose the proper termination date for Fawcett and Ernst's employment agreements does not violate Rule 14a–9.

### iv. Presentation of the Compensation Data.

 Finally, plaintiffs argue that the proxy statement fails to present the total compensation payable to Fawcett and Ernst in a meaningful manner. Fawcett and Ernst's compensation consists of four principal components—salary, bonus, pension benefits, and stock rights. Information regarding the salary and bonus appears on page 4 of the proxy statement, information on the pension benefits appears on page 5, and information on the stock rights appears on page 6. The Plan is described on page 7 and 8 of the proxy statement and makes no reference to this other material. A shareholder who, while reading about the Plan, seeks this information, must, without any assistance, work back through the proxy statement to collate this information. Although that data appears elsewhere in the proxy statement, the discussion of the Plan does not present the shareholder with sufficient information to locate and collate this other material.[30] Upon review, the Court finds that the failure to aggregate Fawcett and Ernst's compensation data constitutes a materially misleading omission from the proxy statement.

### d. Origins of the Plan.

Plaintiff also contends that the proxy statement is materially false or misleading because of its disclosures regarding the origin of the Plan. In relevant part, the proxy statement discloses that the "Plan was designed specifically by the Board of Directors ...." Proxy statement at ¶ 3. Upon review, the Court finds plaintiff's argument not well taken.

The testimony at trial indicated that the general concept of a more generous stock option plan for Fawcett and Ernst was discussed by the Board of Directors in late 1982. The drafting of the Plan, however, was undertaken by Ernst and the specifics of the Plan are the product of his efforts. Most significantly, the special provisions of the Plan providing for increased compensation in the event of a reorganization transaction are solely the work of Ernst. To the extent that the proxy statement indicates that the Board of Directors designed the

**30.** Defendants argue that they have disclosed all of this information in the proxy statement and that the nature of its presentation is irrelevant. Upon review, the Court finds this argument not well taken. The disclosures relating to Fawcett's and Ernst's compensation in the proxy statement are scattered throughout the document and are not highlighted in any way. Presentation of this important data in this manner renders the proxy statement materially false or misleading despite the fact that all of the data is disclosed.

Plan, therefore, the proxy statement is somewhat misleading.

■ This statement, however, does not rise to the level of materiality required under Rule 14a–9. A reasonable investor is principally concerned with the terms of the Plan, not its origins. In this case, where the action of the Board of Directors intervenes between the design of the Plan and the Plan's presentation to the shareholders, the actual design of the Plan is of even less significance. While the proxy statement is incorrect in stating that the Plan was designed specifically by the Board of Directors, a reasonable investor would not consider that information important in determining how to vote on the Plan. Accordingly, the Court finds that the proxy statement's failure to fully and accurately disclose the origin and design of the Plan does not constitute a materially misleading omission from the proxy statement.

*e. Purposes of the Plan.*

■ In relevant part, the Plan's stated purposes are:

> to compensate Messrs. Fawcett and Ernst for their more than 35 years of dedicated service to the company and to provide them with the strong incentive to remain with the company while continuing to explore the possible advantageous disposition of the company on the best possible terms for the company's shareholders.

Proxy statement at ¶ 3. Plaintiff contends that the proxy statement is false and misleading because of its failure to disclose (1) that Fawcett and Ernst were already obligated to perform these duties under their employment agreements, and (2) that Fawcett and Ernst had decided to delay any disposition of the company until the six month period for short-swing profits under § 16(b) of the Exchange Act had expired. The issue of the materiality of these omissions remains. The Court finds that a reasonable investor is less concerned with the stated purposes of the Plan than with its terms. Further, the disclosures sought by plaintiff would only serve to explain the disclosures already addressed by the proxy

statement. While some investors may find this information of some significance, the "information is of such dubious significance that insistence on its disclosure may accomplish more harm than good." *TSC Industries*, 426 U.S. at 448, 96 S.Ct. at 2132. Accordingly, the Court finds that neither of these omissions represents a material omission from the proxy statement.

*f. Disclosure of Terms of the Plan.*

Two problems arise with the disclosures regarding the terms of the Plan. The proxy statement does not indicate the relationship between the number of options granted and the total shares of common stock outstanding. Also, a potential problem exists with the proxy statement's disclosures regarding the amounts payable to Fawcett and Ernst upon a reorganization transaction. A separate analysis of these two issues follows.

*i. Number of options granted.* In its discussion of the Plan, the proxy statement clearly indicates that options and SARs on 200,000 shares of Mohawk common stock had been granted to Fawcett and Ernst. Proxy statement at ¶ 2. The total amount of outstanding Mohawk Common Stock, 2,163,565 shares is also disclosed at another point in the proxy statement. *Id.* at 1. The issue presented by these two disclosures, however, is whether the fact that the Plan envisions granting options on shares representing 9¼% of Mohawk's outstanding common stock needs to be more prominently identified in the discussion of the Plan.

■ The proxy statement makes no indication that such a large portion of Mohawk's stock is involved. Arguably, a reasonable investor would not make the assumption that the Plan provides for the granting of options on shares representing 9¼% of the outstanding common stock. If a shareholder sought to make this calculation, the necessary data is available. In the Court's view, it would be a desirable feature of a proxy statement to state precisely the percentage of the outstanding stock involved in the proposed grant of options. Failure to make such a disclosure in this

case, however, does not render the proxy statement materially false or misleading.

*ii. Amount payable in the event of a reorganization transaction.* In relevant part, the proxy statement discloses that:

if the company is acquired, Messrs. Fawcett and Ernst will be required to surrender their options and SARs and will receive with respect to each share covered thereby the lesser of the per share consideration paid in such acquisition or four times the difference between such per share consideration and $24.125.

Proxy statement at ¶ 3. Plaintiff contends that this disclosure is materially false and misleading because it fails to set forth numerically the amount of cash to be received by Fawcett and Ernst in the event of a reorganization transaction.

As explained in the Supplemental proxy statement, the reorganization premium in the Plan provides that if a reorganization transaction takes place at $32.00 per share, Fawcett and Ernst would split $6.3 Million upon the surrender of their options and SARs. At no point in the proxy statement, however, is there any disclosure of this amount or any indication that the value of the surrendered options and SARs would be of this magnitude. A reasonable investor would not otherwise assume that the options and SARs would have such a high surrender value. While the formula for calculating this value is disclosed in the proxy statement, its presentation does not give the reasonable investor any signal that it is important to perform these rather detailed calculations. As defendants' own expert on executive compensation testified, the multiplier provision of the reorganization premium is a unique compensation device in the field of executive compensation.

■ Given the possibility of a reorganization transaction involving Mohawk as disclosed in the proxy statement,[31] a reasona-

ble investor would consider the surrender value of the options and SARs in the event of a reorganization transaction of critical importance in evaluating the Plan. Yet, the proxy statement, unlike the supplemental proxy statement, fails to disclose examples of the surrender values of these options and SARs, nor does it present the data necessary to make the calculations in a manner readily understandable by the reasonable investor. Accordingly, the Court finds that it is materially misleading because of its failure to disclose the surrender value of the options and SARs in the event of a reorganization transaction.

*g. Disclosure of the Applicable Majority Vote Provisions.*

In relevant part, the proxy statement states that "Adoption of the 1983 Non-Qualified Stock Option Plan will require an approval vote by the holders of the majority of the shares of the Common Stock present, or represented, and entitled to vote at the Annual Meeting." Proxy statement at ¶ 10. Plaintiff contends that this disclosure is materially false or misleading because Mohawk's Code of Regulations sets a different majority approval requirement.

■ While the Court has previously ruled that the Code of Regulations majority approval standard applies to the vote on the Plan, the Court concludes that this misstatement does not reach the level of materiality required by Rule 14a–9. A reasonable investor considering the Plan would be principally concerned with the terms of the Plan, not its likelihood of shareholder approval. Where, as here, the disclosure relates to two methods of calculating a majority affirmative vote, any defect in the disclosure would not assume sufficient significance to affect the vote of the reasonable investor. Accordingly, the Court concludes

---

**31.** During the year prior to the presentation of the Plan to Mohawk's shareholders, Mohawk management was approached by approximately ten potential suitors. Further, a number of investors had acquired substantial blocks of Mohawk stock with the goal of arranging a reorganization transaction involving Mohawk.

Finally, Mohawk's management demonstrated its awareness of the possibility of a reorganization transaction taking place within a short period of time by drafting the Plan to fall within the Rule 16b–3 exemption to the short-swing profit rules.

that the disclosure is not materially false or misleading under Rule 14a–9.[32]

## IV. CONCLUSIONS OF LAW.

Pursuant to the foregoing legal analysis, the Court concludes, as a matter of law, that:

1. The Plan received the shareholder approval required by the terms of the Plan.

2. The Plan did not receive the shareholder approval required under Mohawk's Code of Regulations.

3. The Plan was not approved by the shareholders.

4. Defendants violated § 14(a) of the Exchange Act and Exchange Act Rule 14a–9 by issuing a proxy statement that was materially false and misleading with respect to:

 a) the activities of the Board of Directors on January 4, 1983;

 b) the actions of the option committee in granting the options to Fawcett and Ernst;

 c) the pension benefits payable to Fawcett and Ernst;

 d) the omission of aggregate compensation data for Fawcett and Ernst; and

 e) the omission of a readily understandable explanation of the reorganization premium payable to Fawcett and Ernst.

## V. RELIEF

In light of the foregoing analysis, the Court enters judgment as follows:

1. The Plan and the grant of options and related SARs on 200,000 shares of Mohawk common stock to Fawcett and Ernst is hereby declared null and void.

2. The Plan and the options and related SARs granted thereunder are hereby declared to have been terminated in accordance with the express terms of the Plan and are of no further force and effect.

3. Defendants are hereby permanently enjoined from issuing any further options or related SARs pursuant to the Plan.

## APPENDIX A

### 1983 NON–QUALIFIED STOCK OPTION PLAN

[¶ 1] The Board of Directors, at its meeting of January 4, 1983, adopted, and directed to be submitted to the shareholders of the Company for their approval, the 1983 Non-Qualified Stock Option Plan (the "1983 Plan"). At the same meeting, the Board terminated the 1982 Incentive Stock Option Plan covering options never granted on 100,000 shares of Common Stock.

[¶ 2] The 1983 Plan provides for the granting of options ("Options"), and stock appreciation rights in tandem with options ("SARs"), on 200,000 shares of Common Stock to those officers who share the primary responsibility for the management, growth and protection of the business of the Company. Subject to shareholder approval and pursuant to the 1983 Plan, the Option Committee on January 4, 1983 granted Options and related SARs on 120,000 shares to Henry M. Fawcett and on 80,000 shares to William T. Ernst. In each case the option price was $24.125 per share, representing the closing price of the Company's Common Stock on the New York Stock Exchange on January 3, 1983. The closing price of the Company's Common Stock on said Exchange on February 16, 1983 was $28.00.

---

**32.** Plaintiff has cited a number of cases in which proxy statements were held to be materially false or misleading because of their failure to disclose legal information. *See Joyce v. Joyce Beverages, Inc.,* 571 F.2d 703 (2d Cir. 1978), *cert. denied,* 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978); *Avnet Inc. v. Scope Industries,* 499 F.Supp. 1121, 1124 (S.D.N.Y. 1980); *Copperweld Corp. v. Imetal,* 403 F.Supp. 579, 606 (W.D.Pa.1975). In *Copper-*

*weld,* for example, disclosure of possible antitrust violations was required. Such a disclosure goes to the merits of the proposed corporate action; the disclosure sought by plaintiff in this case goes only to the procedures for shareholder approval. The disclosures required by these decisions, therefore, are distinguishable from the disclosures sought by plaintiff in this case.

[¶ 3] The 1983 Plan was designed specifically by the Board of Directors to compensate Messrs. Fawcett and Ernst for their more than 35 years of dedicated service to the Company and to provides them with a strong incentive to remain with the Company while continuing to explore the possible advantageous disposition of the Company on the best possible terms for the Company's shareholders. As described below, if the Company is acquired, Messrs. Fawcett and Ernst will be required to surrender their Options and SARs and will receive with respect to each share covered thereby the lesser of the per share consideration paid in such acquisition or four times the difference between such per share consideration and $24.125.

[¶ 4] The 1983 Plan provides that in the event of merger, consolidation, sale of assets or dissolution of the Company (each, a "Reorganization Transaction") or a change in control of the Company (defined as an acquisition of 50% or more of the Company's voting stock), each Optionee is required to surrender to the Company all outstanding and unexercised Options and related SARs in exchange for a cash payment in an amount equal to the lesser of (i) the "per share consideration" or (ii) four times the difference between the "per share consideration" and the Option Price per share. The 1983 Plan defines "per share consideration" to mean (x) in the case of a Reorganization Transaction, the value of the consideration to be paid with respect to each share pursuant to the Reorganization Transaction or (y) in the case of a change in control, the value of the per share consideration offered to shareholders pursuant to the tender or exchange offer if the change in control resulted therefrom or the fair market value of one share of stock on the date the change in control occurred if it occurred other than pursuant to a tender or exchange offer, in each case as determined by the Option Committee.

[¶ 5] An Option Committee (the "Committee"), consisting of three disinterested members of the Board of Directors appointed by the Board of Directors, shall administer the Plan. The members of the Committee are C. Blake McDowell, Jr., Charles A. Sanders, M.D. and William B. Saxbe. Members of the Committee are not eligible to be granted options.

[¶ 6] Each Option granted under the Plan will expire on the expiration of ten (10) years from the date of grant. The Option price per share may not be less than one hundred percent (100%) of the fair market value of the stock at the time the Option is granted.

[¶ 7] The Option is not transferable by the Optionee otherwise than by Will or the laws of descent and distribution and is exercisable during the Optionee's lifetime only by the Optionee.

[¶ 8] The SARs will entitle the Optionee to receive upon exercise an amount equal to the difference between the exercise price of the underlying Option and the market price of the stock subject to that Option at the time of its exercise. The SARs may be exercised only by surrendering the right to exercise the underlying stock Option. Payment upon exercise of the SARs may be determined by the Committee. The SARs, by their terms, will expire upon expiration of the underlying Option, are transferable only when the underlying Option is eligible to be exercised, and may be exercised only when the market price of the Common Stock subject to the Option exceeds the exercise price.

[¶ 9] Under present Federal income tax law, the difference between the exercise price of an Option and the fair market value of the Common Stock on the date an Option or SARs is exercised is taxable as ordinary income to the Optionee and is deductible by the Company at the time of exercise. Such amount will be subject to the withholding of tax by the Company. Gain or loss on a subsequent sale of Common Stock pursuant to the exercise of an Option will be eligible for capital gain or loss treatment. To qualify for capital gain or loss treatment, shares must have been held for more than one year.

[¶ 10] Your management and the Board of Directors recommend adoption of the pro-

posed 1983 Non-Qualified Stock Option Plan set forth in full in Exhibit A to this Proxy Statement. Adoption of the 1983 Non-Qualified Stock Option Plan will require an approval vote by the holders of a majority of the shares of the Common Stock present, or represented, and entitled to vote at the Annual Meeting. Unless the shareholder otherwise specifies in the accompanying Proxy, it will be voted FOR each of the proposals.

## APPENDIX B

### Supplement to Proxy Statement

The following information supplements the Proxy Statement dated March 7, 1983 submitted on behalf of the Board of Directors of The Mohawk Rubber Company. Page numbers refer to pages in the Proxy Statement.

1. Referring to footnote 2 of the Remuneration Table, the employment of Mr. Ernst and Mr. Fawcett under their employment contracts continues until December 31, 1985 and thereafter until terminated by them or the Company upon three years prior written notice. Notice of termination has not been given. (Page 4.)

2. The cost of living adjustments referred to in footnote 2 to the Remuneration Table are based on the Consumer Price Index of January 1978, which was 187.1. Recently that Index has increased to 293 or about 57% above the January 1978 figure. (Page 4.)

3. The table on page 5 of the Proxy Statement is not intended to indicate that the annual annuities payable to Mr. Ernst and Mr. Fawcett are limited to $240,850. Under the Company's Pension Plan for Salaried Employees and the provision of the non-qualified Supplemental Retirement Income Plan for Salaried Employees (the "Supplemental Retirement Plan") designed to provide benefits in excess of limitations imposed by the Employee Retirement Income Security Act of 1974 and the Tax Equity and Fiscal Responsibility Act of 1982, if Mr. Ernst and Mr. Fawcett were to retire at the end of March 1983, they would be entitled to receive lifetime annuities (ten year certain) in the annual amount of $131,269 and $189,469, respectively. In addition, under other provisions of the Supplemental Retirement Plan, if Mr. Ernst and Mr. Fawcett were to retire at March 31, 1983, they would be entitled to receive for four years beginning at age 65 annual payments of $327,552 and $466,019, respectively. These latter payments would satisfy the Company's obligations under their employment contracts. If Mr. Ernst and Mr. Fawcett were to elect to receive the latter payments as lifetime annuities (ten year certain) beginning at age 65 (rather than receiving the payments over four years), the annual annuity payment to Mr. Ernst would be $142,552 and to Mr. Fawcett $198,280. Taking into account both the Pension Plan for Salaried Employees and the Supplemental Retirement Plan, the total annual annuity to Mr. Ernst would be $142,552 and to Mr. Fawcett $198,280. Taking into account both the Pension Plan for Salaried Employees and the Supplemental Retirement Plan, the total annual annuity to Mr. Ernst would be $273,821 and to Mr. Fawcett $387,749. If Mr. Ernst and Mr. Fawcett were to retire at normal retirement age or upon the expiration of their employment contracts, the annual payments could be higher depending upon their salary and bonus for the highest two consecutive years of the five years preceding retirement and the Consumer Price Index. Mr. Fawcett's employment contract provides for a bonus of not less than 5% of Company earnings and historically Mr. Ernst has been paid a bonus approximating 3% of earnings. Pension benefits are being funded on a current basis and have been reflected in the Company's financial statements as set forth in Note G to the financial statements appearing in the 1982 Annual Report. It is estimated that on March 31, 1983 no more than $1,375,000 would be chargeable against future income to fund the Supplemental Retirement Plan. (Page 5.)

4. The potential unrealized value of the options set forth in the table on page 6 of the Proxy Statement represents the difference between the closing price of the Com-

mon Stock on February 16, 1983 and the option price. It does not take into account the option surrender provision that is payable only in the case of a reorganization transaction or a change in control. This provision is described on page 7 of the Proxy Statement. (Page 6.)

5. If the Option Plan is approved by the stockholders and if the Company were then acquired for $28 per share, Mr. Ernst and Mr. Fawcett would receive upon the mandatory cancellation of their options $1,240,-000 and $1,860,000, respectively. If the acquisition price were $30 per share, they would receive $1,880,000 and $2,820,000, respectively. At $32 per share the amounts would be $2,520,000 and $3,780,000, respectively. For each dollar above that per share price at which the Company might be acquired, Mr. Ernst and Mr. Fawcett would receive an additional $80,000 and $120,000, respectively. These amounts would be fully deductible by the Company for tax purposes and would be taxed as ordinary income to Mr. Ernst and Mr. Fawcett. (Page 7.)

6. On March 22, 1983, the Company received from Independence Holding Company an amended Schedule 13D stating that it will not support the Option Plan at the Annual Meeting.

7. On March 25, 1983, an action purportedly brought on behalf of Company shareholders against the Company and each of its Directors was commenced in the United States District Court for the Northern District of Ohio by Albert Fradkin, who claims to own 1,000 shares of the Company's Common Stock and who alleges that the Company's Proxy Statement dated March 7, 1983 was "materially false and misleading" in violation of the federal securities laws in that it failed to disclose or contains false statements regarding, among other things, (1) the full extent of the benefits due Messrs. Fawcett and Ernst under the Option Plan and employment agreements, (2) the impact of these arrangements on proposals by third parties to acquire the Company and (3) the manner in which the Option Plan employment agreements were considered and approved by the Company's Board of Directors. At the appropriate time, by means of an Answer or otherwise, the Company will deny these allegations. Mr. Fradkin sought "to enjoin, preliminarily and permanently, voting upon the Option Plan at the Annual Meeting, unless and until all material facts relating to the Option Plan, and certain employment agreements ... are completely and accurately set forth in a revised proxy statement and disseminated to all Company shareholders." Pursuant to an Order entered by the Honorable John M. Manos on March 30, 1983, (a) the vote upon the Option Plan at the Annual Meeting shall be promptly tabulated, (b) the Company shall make no public announcement concerning the results of the vote except to say whether it was approved or disapproved, (c) the Company shall take no further steps to carry out or to effectuate the Option Plan pending the hearing and determination of the action and (d) the trial of the action will be held before the Honorable David D. Dowd in Akron, Ohio after the Annual Meeting at a time to be determined.